IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE GOOGLE ACCOUNTS **jfassoko@gmail.com** AND **dorcas.manou.assoko@gmail.com** THAT ARE STORED AT PREMISES CONTROLLED BY GOOGLE LLC | Case No. 1:24-SW-624 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Marc Daniel Hess, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Google LLC ("Google"), an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.  I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2010. As such, I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), empowered by law to conduct

investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code.

3. I am currently assigned to the Child Exploitation and Human Trafficking Task Force in the FBI's Washington Field Office. In my capacity as a law enforcement officer, I investigate crimes involving child victims, to include international parental kidnapping.

4. I have participated in the investigation of the offenses set forth below. The facts and information contained in this affidavit are based on my personal knowledge and information obtained from other law enforcement officers and witnesses. All observations referenced in this affidavit that were not personally made by me were relayed to me by the person(s) who made such observations or in reports that detailed the events described by that person(s). This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that an ongoing violation of 18 U.S.C. § 1204(a), international parental kidnapping, has been committed, and continues to be committed, by Adjoh Dorcas Manou Epse Assoko ("**ADJOH**"). There is also probable cause to search the information described in Attachment A for evidence of this crime further described in Attachment B.

## JURISDICTION

6. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), &

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7. On November 16, 2016, **ADJOH** and John Franklin Assoko ("John") were married in the Cote d'Ivoire.  Soon thereafter, the couple moved to the United States for **ADJOH's** job with the World Bank.

8. On August 23, 2023, A.G.A. was born in Washington, D.C.  At the time, the family was residing in Montgomery County, Maryland.

9. On November 1, 2023, **ADJOH** and John separated.

10. In early December 2023, as evidenced in text and email messages John provided the FBI, **ADJOH** attempted to force John to sign a separation agreement.  **ADJOH** explicitly conditioned her willingness to permit John to see their daughter on him signing the separation document she had drafted.

11. In emails between **ADJOH** and John exchanged between December 6, 2023 and December 7, 2023, John made it clear that he was not going to sign the paperwork she had proposed and that he intended on coming to what remained, legally, their marital home to see their child.  In response, **ADJOH** threatened to call the police if he showed up in front of their house and later "dared" him to come to the residence without having signed the separation agreement.  Both of these communications are contained within emails sent from email address **dorcas.manou.assoko@gmail.com** to johnfranklinassoko@yahoo.fr.  Emails of a similar vein were likewise exchanged between the two through email addresses **dorcas.manou.assoko@gmail.com** and **jfassoko@gmail.com** (i.e., the **SUBJECT ACCOUNTS**) on December 7, 2023 through December 9, 2023.

12. On December 8, 2023, when John arrived at the marital home to retrieve A.G.A. for a visitation, **ADJOH** refused to provide him with access to the child and the police were called. The police convinced John to leave without his daughter and, based on claims **ADJOH** had made to them, they encouraged her to obtain a protective order against John. **ADJOH** did precisely that, serving John with an interim restraining order on December 11, 2023. On December 19, 2023, following a hearing conducted in which both parties appeared *pro se* and no interpreter was present (despite the judge's prior assurances that one would be provided), **ADJOH** obtained a Final Protective Order ("FPO") from the District Court of Maryland for Montgomery County that awarded her primary custody of A.G.A. and granted John visitation every weekend, beginning at 4:30 p.m. on Fridays, until approximately 3:00 p.m. on Sundays. A mutual associate of **ADJOH** and John's, J.L., was to handle the pick-up and drop-off of A.G.A. for the couple.

13. On December 20, 2023, the day after her success at the FPO hearing, **ADJOH** initiated a case for divorce and custody in Montgomery County Circuit Court.

14. Initially, **ADJOH** complied with the terms of the FPO. In late January, J.L. reached out to her to relay that he would not be able to drop off A.G.A and proposed that another mutual associate handle the drop-off in his stead. **ADJOH** refused to permit anyone else to perform the drop-off and, in a text message, reminded J.L. that "the judge's order is an order of law," from which "[a]ny deviation is a criminal act."

15. Despite holding others to the letter of the FPO, in February 2024, **ADJOH** began refusing to allow John access to A.G.A. John provided emails from mid through late February 2024 between John, using email address johnfranklinassoko@yahoo.fr, and **ADJOH**, using **dorcas.manou.assoko@gmail.com**, that corroborate this account.

4

16. After **ADJOH** had refused him access to their baby three weekends in a row, on March 14, 2024, John filed a Petition for Contempt for **ADJOH's** violation of the protective order. A contempt hearing was scheduled for April 11, 2024.

17. **ADJOH** did not appear for the April 11, 2024 hearing. The terms of the FPO were modified so that J.L. was no longer responsible for exchanging A.G.A.; instead, visitation exchanges were ordered to take place at the Montgomery County Police Station closest to **ADJOH's** residence. **ADJOH** was provided with the terms of the amended FPO.

18. In various email exchanges between John, using email address johnfranklinassoko@yahoo.fr, and **ADJOH**, using **dorcas.manou.assoko@gmail.com**, in April 2024, **ADJOH** repeatedly refused to comply with the terms of the amended FPO. Accordingly, on April 18, 2024, John filed a second petition for contempt against **ADJOH** for violating the terms of the FPO. **ADJOH** was served with a copy of the Petition for Contempt and Show Cause Order on April 26, 2024. A hearing on the matter was scheduled for a date in May.

19. On April 30, 2024, **ADJOH** and A.G.A. flew from Washington Dulles International Airport, Virginia, located in Fairfax County, to France and then to Cote D'Ivoire. **ADJOH** did not inform John that she was leaving the country with A.G.A. and did not contact him thereafter.

20. On May 3, 2024, at the time John's next scheduled visitation window was to take place, **ADJOH** and A.G.A. had not returned to the United States, thereby frustrating John's ability to exercise the visitation rights afforded to him in the custody portion of the amended FPO.

21. On May 7, 2024, John filed with the Circuit Court for Montgomery County an Emergency Motion for Writ of Ne Exeat and for Temporary Sole Custody of the Minor Child.

22. On May 9, 2024, the Montgomery County Circuit Court held a hearing on that motion, which **ADJOH**, who had not returned to the United States with A.G.A., attended virtually via Zoom. At the conclusion of the hearing, the court entered an order granting John "temporary primary physical custody of the minor child, [A.G.A.] until further Order of this Court."

23. On June 19, 2024, **ADJOH** flew from Cote D'Ivoire to France and then to Washington Dulles International Airport. At that time, **ADJOH** was aware that the Montgomery County Circuit Court's order awarded physical custody to John, but she traveled without A.G.A., who was left in the care of family members in Cote D'Ivoire.

24. The FBI learned that **ADJOH** booked a flight out of Washington Dulles International Airport for June 26, 2024, departing at 6:25 p.m. At approximately 4.36 p.m. on June 26, 2024, before **ADJOH** could board her flight, your affiant and a fellow agent conducted a probable cause arrest at Dulles airport. During the interrogation subsequent to her arrest, **ADJOH** waived the right to counsel and spoke with the agents. **ADJOH** told the agents that A.G.A. was currently in Cote D'Ivoire with relatives but refused to tell the agents the names of the relatives or A.G.A.'s location within Cote D'Ivoire.

25. On July 25, 2024, a grand jury in the Eastern District of Virginia returned an indictment charging **ADJOH** with one count of international parental kidnapping in violation of 18 U.S.C. § 1204, in case number 1:24-CR-172.

26. A preservation request was sent to Google for the **SUBJECT ACCOUNTS** (**dorcas.manou.assoko@gmail.com** and **jfassoko@gmail.com**) on August 27, 2024.

**BACKGROUND CONCERNING GOOGLE**[1]

27. Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

28. In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

29. Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

30. Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered

---

[1] The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages: the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

31.     Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

32.     When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

33.     Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website

or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

34. Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

35. In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element. In this case, based on the emails voluntarily produced by John, the anticipated emails will establish **ADJOH's** conduct of behavior in refusing to provide John with the lawful access to his child as provided for in the FPO and her knowledge that a second contempt violation hearing was upcoming, suggesting her motivation in leaving, as she did, on April 30, 2024, without having notified the District Court or John in advance.

36. Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored

communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

37. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

38. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, as explained above, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

39. Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services. In my training and

experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

40.     Based on the forgoing, I request that the Court issue the proposed search warrant.

41.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Google. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Marc Daniel Hess
Special Agent
Federal Bureau of Investigation

Subscribed and attested to me in accordance with the requirements of Fed. R. Crim. P. 4.1 via telephone on August 30 , 2024

WILLIAM E. FITZPATRICK
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with **jfassoko@gmail.com** and **dorcas.manou.assoko@gmail.com** ("the Accounts") that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

## ATTACHMENT B

### Particular Things to be Seized

**I.**     **Information to be disclosed by Google LLC ("Google")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on August 27, 2024, Google is required to disclose to the government for each account or identifier listed in Attachment A the following information from November 1, 2023 to the date of this order unless otherwise indicated:

    a.    All business records and subscriber information, in any form kept, pertaining to the Account, including:

        1.    Names (including subscriber names, user names, and screen names);

        2.    Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);

        3.    Telephone numbers, including SMS recovery and alternate sign-in numbers;

        4.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including log-in IP addresses;

        5.    Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address, SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers; and

        6.    Length of service (including start date and creation IP) and types of service utilized.

    b.    All device information associated with the Account, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC)

            addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and telephone numbers;

c.      Records of user activity for each connection made to or from the Account(s), including, for all Google services, the date, time, length, and method of connection, data transfer volume, user names, source and destination IP address, name of accessed Google service, and all activity logs; and

d.      Contents of all emails sent and received by the accounts during the period commencing on November 1, 2023 and ending on August 26, 2024.

Google is hereby ordered to disclose the above information to the government within **10 days** of issuance of this warrant.

II.	**Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 1204(a), international parental kidnapping, those violations involving **Adjoh Dorcas Manou Epse Assoko** ("**ADJOH**") and occurring on and after November 1, 2023 through the date of this Order, including, for each Account or identifier listed on Attachment A, information pertaining to the following matters:

a.	Communications between **Adjoh** and John Franklin Assoko ("John"), or other persons, involving John's visitation of their shared child, A.G.A.;

b.	Preparatory steps **Adjoh** took to carry out her removal of their shared child from the United States to Cote d'Ivoire, including:

   a.	Communications with her employer, the World Bank Group, about relocating to the Cote d'Ivoire; and

   b.	Communications or records concerning airline travel for **Adjoh** and A.G.A. from Washington, D.C. to the Cote d'Ivoire.

c.	Evidence indicating how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

d.	Evidence indicating the Account owner's state of mind as it relates to the crime under investigation;

e.	The identity of the person(s) who created or used the Account, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed

electronic data to the custody and control of attorneys for the government and their support staff for their independent review